MICHAEL GAINES, ESQ. (CSBN 50553)
Attorney at Law
255 Kansas Street, Suite 340
San Francisco, CA 94103
Telephone: (415) 565-9600
Facsimile: (415) 565-9601

Attorneys for Defendant LYDIA FONG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>    vs.<br><br>LYDIA FONG,<br><br>         Defendant. | CR No. 3:12–CR–301 CRB<br><br>**SENTENCING MEMORANDUM** |

Lydia Fong has pleaded guilty to a single count of bid-rigging, in violation of the Sherman Act (15 U.S.C. §1).

**I.    Introduction**

Ms. Fong, now 55 years old, is a first-time, non-violent offender who promptly accepted responsibility for her wrongdoing, and has helped the government hold other participants in the illegal bid-rigging scheme accountable. Ms. Fong is deeply ashamed of her conduct, and is conscious of the damage that she has done to the lenders, investors, and homeowners who were the victims of the scheme as well as the many others who were caught up in it.

Her terrible decision to become involved in bid-rigging is a stain on an otherwise exemplary record of hard work, success, and devotion to her family. Since coming to this country in 1986, Ms. Fong has built a successful career as a real estate agent, and brought up two children with her husband

of thirty-two years, Liping Fong, who has worked as a mechanic for The San Francisco Municipal Transportation Agency (MUNI) since September of 2001.

Ms. Fong became a real estate agent in 1994, when she began working for Prudential California Realty. During Ms. Fong's tenure with the real estate agency, it changed names from Prudential to John Douglas and then Coldwell Banker. In 2005 Ms. Fong left Coldwell Banker to begin working for Ben Hom Associates as a real estate agent. In her real estate practice, Ms. Fong sold both residential and commercial properties. Generally, Ms. Fong enjoyed a successful and enjoyable career—especially where it involved first time homebuyers, with many of whom Ms. Fong still maintains close personal relationships.

The loss of Ms. Fong's livelihood, which she did well and for many years, weighs upon Ms. Fong and has had an impact greater than simply disqualifying her from her chosen profession. At this time, Ms. Fong is not a licensed realtor. She manages and maintains real estate properties, but no longer participates in the selling or showing of properties, which is a source of tremendous sadness in her life. Ms. Fong has been diagnosed with depression and anxiety, for which she has been prescribed medication and regularly attends therapy. Overall, this legal case has been very isolating for Ms. Fong, who was a successful and proud businesswoman for many years, that found purpose in her work and great satisfaction in the authentic and on-going relationships she developed with her clients.

**II.    Ms. Fong's Role in the Bid-Rigging**

More than forty people have been federally prosecuted and pleaded guilty as a result of the government's investigation into rigged auctions in the counties of Contra Costa, Alameda, San Francisco, and San Mateo. To her great shame, Ms. Fong is one of them. Ms. Fong and her real estate partner, Mr. Kuo Chang, accepted payments from realtors Joseph Giraudo, Kevin Cullinane, Mohammed Rezaian, Daniel Rosenbledt, and Ray Grinsell—described by other witnesses as the "Big Five"—to refrain from bidding at trustee sales in San Mateo County. The group also let Ms. Fong purchase properties that she wanted in exchange for cash payoffs.

Ms. Fong had no part in setting up the bid-rigging conspiracy, which was already well-established when she began attending trustee sales in late 2008. (PSR, ¶ 16.) Although Ms. Fong was aware of the practice of bid-rigging, she did not enter the trustee sales market with that purpose in

mind. In fact, Ms. Fong and Mr. Chang initially *frustrated* the bid-rigging process by placing legitimate bids on foreclosed properties, winning four auctions. (*Id.*, ¶ 17.) In response, the Big Five ordered another participant to outbid Ms. Fong in an effort to discourage her from coming to the auctions. (*Id.*) It was only after one of the men offered to stop bidding in exchange for a payoff—making it clear that bid-rigging was effectively the cost of entry at the trustee auctions—that Ms. Fong began to participate. (*Id.*) Over the following months, Ms. Fong attended ten rigged auctions, buying five properties and accepting payoffs to refrain from bidding at the others. The rigging was not arranged in advance. Instead, during the auction, members of the Big Five approached Ms. Fong and Mr. Chang to offer or demand payoffs. (*Id.*, ¶¶ 17–18.)

Ms. Fong's dealings with the Big Five mirror the experience of the two brothers who first informed the government about the bid-rigging. The brothers stated that the Big Five "dominated" the auctions—especially Mr. Giraudo, whom other witnesses called the "King" of the group—and were "at the center of the bid rigging conduct." (*Id.*, ¶ 8.) One of the brothers described an instance in which Mr. Giraudo approached him during an auction and threatened to "bid . . . up" the property the brother was seeking to buy unless he paid Mr. Giraudo $5,000. (*Id.*, ¶ 7.) Like Ms. Fong, the informant succumbed and made the illegal payoff. (*Id.*)

Ms. Fong was not a major participant, but one of many bidders at the periphery of this illegal scheme, who entered the trustee sales market for legitimate purposes, but subsequently took part in the conspiracy when approached by one of the members of the core group.

### III. Ms. Fong's Cooperation with the Government

On November 8, 2014, Ms. Fong was interviewed pursuant to her plea agreement in the presence of counsel at the Department of Justice Antitrust Division, 450 Golden Gate Avenue. Present during the interview were Trial Attorney David Ward and Paralegal Vadim Nisebaum.

A review of Federal Bureau of Investigation (FBI) documents regarding the debriefing interview clearly demonstrates that Ms. Fong was forthright, providing full and detailed information concerning the trustee sales contemplated by the investigation.

//

Ms. Fong told the government's representatives that she became interested in purchasing property at trustee sales and learned off them through a personal friend, Florence Fung. Ms. Fung was the person who explained the process of trustee sales to Ms. Fong. Ms. Fung was the first person to explain to Ms. Fong that on occasion, one had to pay a fee over the purchase price to others in order to be successful at purchasing the properties. Ms. Fung also received money from other bidders for not bidding against them.

At her debriefing, Ms. Fong identified Joseph Giraudo, Kevin Cullinane, Mohammed Rezaian, Daniel Rosenbledt, and Ray Grinsell as the individuals who made the agreements not to bid. These individuals were clearly some of the principal players at the trustee sales. These names had been provided to Ms. Fong by Ms. Fung.

Before Ms. Fong was involved in the transactions subject to this investigation, she had participated in legal and legitimate real estate dealings. One of the individuals Ms. Fong worked with and eventually attended trustee sales with was Mr. Kuo Chang. Ms. Fong had assisted Mr. Chang as early as 2000 with the purchase of a McDonald's restaurant in San Francisco. The two renewed their real estate relationship in 2008 when they purchased a property on 9th Avenue in San Francisco. This property was not purchased at auction. It was after this that Mr. Chang and Ms. Fong decided to become partners and invest in properties sold at trustee sales. Ms. Fong, in speaking with the FBI during her debriefing interview, indicated that she was aware that payments were made for agreeing to refrain from bidding or stop bidding against others. In late 2008, Ms. Fong began attending trustee sales, initially to observe the process. Thereafter, Ms. Fong provided details of any activity that she was involved in at the trustee sales, including those for the following properties, some of which she did not partake in or could not recall:

- 25 Lisbon Street, San Francisco on 10/21/2009: Mr. Chang agreed to pay a $1,000 fee to stop others from bidding and thereby won the auction.;
- 474 Sawyer Street, San Francisco on 10/23/2009: An agreement was made so Mr. Chang and Ms. Fong could be successful. They paid a group that included the Big Five $7,000;
- 1343-1345 Guerrero Street, San Francisco on 10/26/2009: Ms. Fong received $5,000 from Mr. Grisnell for not bidding on the property;

– 4 –

- 442 Holloway Avenue, San Francisco on 1/2/2010: Mr. Rezaian agreed to pay $8,000 to Mr. Chang and Ms. Fong to stop bidding.
- 2250 33rd Avenue, San Francisco on 1/19/2010: Ms. Fong did not recall this property;
- 65 Reddy Street, San Francisco on 2/5/2010: Mr. Chang received a payment for this property but Ms. Fong was not a participant;
- 227 Arguello, San Francisco on 2/16/2010: Ms. Fong did not participate in a payoff agreement for this property;
- 627 Thornton Avenue, San Francisco on 8/12/2010: Ms. Fong paid Mr. Grinsell and Mr. Ash Gujral $3,000 so they would stop bidding against her. Ms. Fong won the auction;
- 282 Holladay Avenue, San Francisco on 9/1/2010: Ms. Fong did not recall this property;
- 1647 47th Avenue, San Francisco on 9/30/2010: Mr. Chang and Ms. Fong agreed to pay Mr. Grinsell $8,000, who would split the money with Mr. Giraudo, Mr. Resaizan, a man named Jim, and others;
- 270 Bright Street, San Francisco on 11/24/2010: Ms. Fong and Mr. Chang agreed to stop bidding on the property for $2,000.
- 121 Judson Avenue, San Francisco on 11/24/2010: Ms. Fong and Mr. Chang paid $8,000 to stop others from bidding. Mr. Chang won the auction;
- 1515 Thomas Avenue, San Francisco, 1/4/2011: There was no payoff agreement for this property, Mr. Chang won the auction while Mr. Rezaian and Mr. Lipton were distracted by an argument the two were having.

The information Ms. Fong provided impacted the prosecutions of Mr. Giraudo, Mr. Rezaian, Mr. Grinsell, Mr. Rosenbledt, Mr. Lipton, Ms. Fung, and others. The detail that is manifest in the documents provided by the Federal Bureau of Investigation, chronicling the debriefing of Ms. Fong surely played a role in advising other defendants of potential evidence that was available against them. Therefore, Ms. Fong's information was instrumental in causing resolutions to be reached without trial in majority of the bid-rigging cases.

//
//

## IV. Guidelines Calculation

Although the Sentencing Guidelines provide the starting point for the sentencing process, they are neither binding nor presumed reasonable. *Nelson v. United States*, 555 U.S. 350 (2009); *Rita v. United States*, 551 U.S. 338 (2007). The Guidelines are but one factor the Court must consider, but they are not to be given any more weight than any other factor. *Gall v. United States*, 552 U.S. 38, 50 (2007) (upholding probationary sentence on Guidelines range of 30-37 months).

In her plea agreement, Ms. Fong and the government agreed to the following guidelines calculation, which has now been accepted by the Probation Office: Base Offense Level 12, (U.S.S.G. §2R1.1(a)); a one-level increase for conduct involving an agreement to submit non-competitive bids (U.S.S.G. §2R1.1(b)(1)); a two-level increase for the stipulated volume of commerce of $1,337,800 (U.S.S.G. §2R1.1(b)(2)); and a two-level decrease for acceptance of responsibility (U.S.S.G. §3E1.1).

This yields an offense level of 13. Ms. Fong has no criminal history whatsoever. Hence, with a Criminal History Category I, the low end of the resulting guidelines range—*before* any reduction for the substantial assistance she provided to the prosecution under U.S.S.G. § 5K1.1—would be 12 months.

## V. The Section 3553(a) Factors Support a Downward Variance

### A. A Probationary Sentence Will Adequately Reflect the Seriousness of the Offense Conduct, as Well As Recognizing Ms. Fong's Assistance to the Government

After first entering a guilty plea in 2012, Ms. Fong has been awaiting sentencing for approximately six years. During that time, Ms. Fong has lost the credential which was the basis for her successful livelihood- her real estate license. This has been very distressing for Ms. Fong, as she took great pride in both the success of her work as a real estate agent and the relationships she developed, especially with first-time homebuyers.

During her presentence investigation interview with United States Probation Officer Aakash Raju, Ms. Fong was extremely open concerning the impact that these proceedings have had on her. She explained that when it came time to enter her plea of guilty on the renegotiated plea agreement, the impact was devastating. Ms. Fong's ability to function in the world as she previously had was now impossible. Ms. Fong felt that she needed to seek professional help and did so. Ms. Fong explained

that she has been diagnosed with severe anxiety and symptoms of depression that required both therapy and medication. Since the probation interview, Ms. Fong has continued to adhere strictly to that regimen to help her cope with the legal proceedings.

These changes in Ms. Fong's demeanor have not been lost on her counsel. Having worked with her for the previous seven years, from the inception of the investigation to this sentencing date, it has been distressing to observe Ms. Fong's current state of mind. Yet, Ms. Fong remains a completely cooperative individual whose attention to detail and acute memory of the events of the trustee sales has been most helpful in guiding her to the conclusion of this case.

B.  To Avoid an Unwarranted Sentencing Disparity, the Court Should Follow the Approach It Took in the East Bay Bid-Rigging Cases

In passing sentence, the Court must consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). In this case, the Court has the benefit of thirty-two sentences which have already been pronounced for very similar bid-rigging offenses in Alameda and Contra Costa Counties, all of which were brought as a result of the same FBI investigation that led to the charges against Ms. Fong. Though these previous sentences, which are shown in the attached schedule, do not bind the Court, they are offered to assist in calibrating a sentence which will adequately penalize Ms. Fong while avoiding any unnecessary disparities with defendants who engaged in bid-rigging in these nearby counties.

In those cases, the Court considered a wide variety of offenders. Some were central in orchestrating the bid-rigging of hundreds of auctions, others had played a more peripheral role; some offenders entered early guilty pleas and cooperated extensively, others had pretended to cooperate while concealing important information from the government. The Court exercised leniency towards offenders who accepted responsibility for the wrongfulness of their conduct, expressed a willingness to make restitution, and "took the additional step of providing cooperation to the Government." *United States v. Zepernick*, No. CR 14–512, Dkt. 33 at 15. Where these mitigating factors coincided, the Court granted probation with house arrest, despite the Sentencing Guidelines' general policy statement favoring incarceration in antitrust cases.

The case of Chung Li Cheng is illustrative of the Court's approach. Mr. Cheng participated in the rigging of 364 auctions, either personally or through the employees of his real estate firm. Mr. Cheng bought 108 properties for his firm's clients and $24.7 millions of interstate commerce was affected. *United States v. Chung Li Cheng*, No. CR 14–593, Dkt. 32 at 2–3. Mr. Cheng stipulated to an offense level of 18. (*Id.*) A rote application of the Sentencing Guidelines would certainly have yielded a prison sentence for Mr. Cheng. However, in light of his remorse, extensive cooperation, and previous good character, the Court sentenced Mr. Cheng to three years of probation with ten months of house arrest. Likewise, John Shiells participated in 176 rigged auctions, where the volume of commerce was approximately $5 million. *United States v. John Shiells*, No. CR 14–581, Dkt. 57 at 2–3. Although Mr. Shiells only pled guilty after he was indicted, he received a probationary sentence with house arrest in light of his cooperation with the government and his status as a first-time offender.

In contrast, the Court has imprisoned other defendants who have been dishonest, uncooperative, or otherwise subject to aggravating factors. For example, Michael Marr, Javier Sanchez, and Gregory Casorso, who orchestrated and masterminded bid-rigging, were sentenced to imprisonment. *United States v. Michael Marr, et. al.* No. CR 14-580, Dkt. 348, 358, 360 (roles in the bid-rigging) 377, 379, 437 (sentenced to imprisonment). Leslie Gee, who concealed information from the government despite promises to cooperate, was sentenced to a term of imprisonment. *United States v. Leslie Gee*, No. CR 14–3, Dkt. 40. The Court also sentenced Ramin Yeganeh, who lied about assets, employment history, and other matters, to prison time. *United States v. Ramin Yeganeh*, No. CR 15–339, Dkt. 101. Finally, defendants such as Brian McKinzie and Nicholas Diaz, who were not first-time offenders, were sentenced to imprisonment for their bid-rigging convictions. *United States v. Brian McKinzie*, No. CR 11-424, Dkt. 99, 101; *United States v. John Galloway, et. al.,* No. CR 14-607, Dkt. 273 at 9, 278.

The factors in Ms. Fong's case weigh heavily in favor of a sentence consistent with those in the Cheng and Shiells cases. Ms. Fong pleaded guilty before the government committed the time, resources, and man power necessary to indicting her; cooperated with the government; expressed her deep remorse for her behavior; and the volume of commerce affected was $1.337 million—significantly less than that in the Cheng or Shiells cases. Unlike the cases where defendants were

sentenced to time in prison, Ms. Fong is a first-time offender, did not orchestrate or mastermind the bid-rigging, and was forthright with the government. In light of these facts, Ms. Fong is firmly in the category of defendants to whom the Court has previously been willing to grant probation. Imposing a prison sentence in Ms. Fong's case would create a large, unjustifiable disparity with defendants such as Mr. Cheng and Mr. Shiells, who participated in many more rigged auctions and whose offenses affected a much larger volume of commerce.

**VI.   Conclusion**

There is a palpable sadness that Lydia Fong is at this point in her life. This investigation and her acceptance of personal responsibility has resulted in the loss of her livelihood, which provided her much joy and satisfaction. In addition, Ms. Fong is a non-violent, first time offender who accepted responsibility for her wrong-doing and chronicled those events with exquisite detail. Surely, this detail assisted the government in its efforts to hold other participants accountable.

Now, Ms. Fong is labelled a felon. She has spent over six years with this prosecution looming, and of late, has become increasingly worried, as manifested by her diagnosed depression and anxiety. At this time, Ms. Fong must receive her sentence and it is respectfully requested, as has been recommended by United States Probation Officer Aakash Raju, in light of the other sentences meted out in similar cases to defendants with similar and even greater culpability, that Ms. Fong be granted three years of probation with three months of home confinement using electronic monitoring technology. Nothing about Lydia Fong suggests that she will not adhere strictly to the conditions of probation imposed by the court.

Date: April 16, 2018                                              Respectfully submitted,


_/s/ Michael Gaines_____
MICHAEL GAINES
Attorney for Defendant
LYDIA FONG